IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America *ex rel.* DARNELL BRIDGES, <br><br> Petitioner, <br><br> vs. <br><br> JOHN EVANS, Warden, Pinckneyville Correctional Center, <br><br> Respondent. | Case No. 04 C 6447 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Darnell Bridges has petitioned the Court under 28 U.S.C. § 2254 for a writ of habeas corpus. He was convicted in state court of aggravated battery with a firearm and was sentenced to nine years in prison. Bridges, who was just short of eighteen at the time of his arrest, contends that the Illinois Appellate Court erred by failing to apply special scrutiny in reviewing the voluntariness of his confession. Bridges also argues that he was denied effective assistance of counsel at trial because his attorney failed to move to formally admit impeaching police notes into evidence. The Court concludes that neither of the Appellate Court's holdings was contrary to or an unreasonable application of federal law and therefore denies Bridges' petition.

### Facts

On December 28, 1998, at around 3:50 p.m., off-duty Chicago police officer Stacy Spires was the unintended victim of a gang-related shooting. Spires had just exited a van outside her

1

mother's house, when she heard gunshots and noticed that her eleven-year-old niece was running toward the house. She chased after the child and took her to the ground. While shielding her niece's body, Spires was shot in the pelvic area.

Troy Agnew, the intended target of the shooting, told police he had seen Bridges near the crime scene. In the early evening of the same day, the police took Bridges into custody at a local grocery store where he was working. Detective Edward Winstead began to question Bridges around 8:30 p.m. Winstead testified at a hearing on a motion to suppress evidence and at trial that after being given the *Miranda* warnings, Bridges revealed that he and other members of the Mickey Cobras street gang had decided to shoot Agnew, a member of the rival Gangster Disciples gang, to avenge the shooting of a fellow gang member a few days earlier. Bridges said the plan was for two of his companions to shoot while the other four, including Bridges, acted as lookouts. Bridges named and described the other five persons he said were involved.

After detectives had questioned Bridges for about thirty minutes, Bridges was taken to a smaller, more secure interview room. At 11:00 p.m., Bridges was taken from the police station by detective Stanley Turner and other officers, so he could show them the homes of three of the persons he had said were involved in the shooting. The three were taken into custody, and Bridges was returned to the interview room around 12:00 a.m.

Winstead testified he spoke with Bridges again around 3:30 a.m., along with Assistant State's Attorney Cathleen Dillon. Bridges repeated essentially the same account he had given before. After this conversation, Bridges was again returned to the smaller room where he had been kept. Winstead and Dillon questioned Bridges again around 6:10 a.m. During this session, Bridges signed a statement that Dillon had written out. In the statement, Bridges states he

"associates with the Mickey Cobras gang" and that he and a friend "stayed on the corner of 72nd and Paulina to look out for the police" and "were going to yell Blue and Whites if he saw any." This session lasted a little over an hour.

Prior to trial, Bridges moved to suppress the statements on the ground they had been given involuntarily. Bridges testified at the hearing. He claimed he had not read the written statement before signing it. He testified that in the initial session with the police, detective Turner had told him that if he did not give a statement, Turner would arrest his parents, and asked Bridges whether he wanted to protect his friends or his parents. Bridges said he asked to speak to his parents, but Winstead replied his parents could not see him because he was seventeen years old. Winstead and Turner both testified and denied Bridges' claims. Bridges also testified that Dillon had likewise turned down his request to speak with his parents, but Dillon denied that Bridges had made any such request.

Bridges' mother, Linda Bridges, also testified at the hearing. She stated that she arrived home around 5:45 p.m. on the day of the shooting, and Turner was there when she arrived. She ultimately agreed to take Turner to her son's location. Turner followed Linda Bridges to a Dominick's grocery store where Bridges worked five nights per week. At the store, Turner questioned Bridges in presence of his mother and the store manager, asking only if Bridges had driven to the store and what time he had arrived at work. Linda Bridges testified she volunteered to take her son to the police station after he finished work if Turner wanted to question him further. She said Turner told her that would be unnecessary.

Ten to fifteen minutes after Linda Bridges and Turner left the store, three other police officers arrived and took Bridges into custody. Linda Bridges testified that she and her husband

3

learned of the arrest from their daughter several hours later, at 12:15 a.m. They drove to the police station, and Linda Bridges met with Turner, who, she said, claimed he had been unaware that Bridges was at the station until around 12:00 a.m. Linda Bridges testified that she and her husband asked if they could see their son, and that although Turner said they could, their request was not accommodated. They later asked Turner again, and he replied that they could see their son after the assistant state's attorney arrived. However, the Bridges were never allowed to see their son.

The trial judge denied Bridges' motion to suppress his statements. After a jury trial, Bridges was acquitted of attempted murder but was convicted of aggravated battery with a firearm and was sentenced to nine years in prison. The Illinois Appellate Court affirmed the conviction and sentence, *People v. Bridges*, No. 1-01-0194 (Ill. App. May 20, 2003), and Bridges' petition for leave to appeal was denied by the Illinois Supreme Court.

We take the following recitation of the facts relating to the motion to suppress from the Appellate Court's decision. In his petition and supporting memoranda, Bridges does not attempt to overcome the presumption of correctness that applies in a habeas corpus case to the state court's findings of fact. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); 28 U.S.C. § 2254(e)(1).

> We note initially, that the defendant was 17 years old at the time of his arrest. From our review of the record, the defendant was less than one month from his 18th birthday. ...
>
> Examining the other factors for this court to take into consideration in order to determine the voluntariness of the defendant's contention, we look to the defendant's intelligence, background, experience, mental capacity, education and physical condition at the time of the questioning. According to the record, the defendant was a senior in high school with plans to continue his education at a

4

trade school. Copies of the defendant's report cards have been made part of the record and reflect that he attended school regularly and received average grades. At the time of his arrest, the defendant lived at home with both parents and other siblings. All of the defendant's siblings graduated from high school and held jobs. The defendant worked as a bagger at Dominick's grocery store after school. Finally, the record reflects no impairment in the defendant's physical condition at the time of questioning. We find nothing in the defendant's intelligence, background, experience, mental capacity, education, or physical condition, that would hinder his ability to give a statement freely and voluntarily.

... Detective Winstead testified at the suppression hearing regarding the nature of the interrogation of the defendant. He testified that he met the defendant in a conference room at the police station at approximately 8:30 p.m. on the evening of the shooting. Winstead had the handcuffs removed from the defendant. Winstead spoke with the defendant for about 30 minutes and then put him in a different room. Winstead spoke next with the defendant at about 3:30 a.m. the following morning in a "missing team office." Winstead described that office as a small room with two desks. The defendant was not handcuffed. Winstead once again spoke to the defendant for approximately 30 minutes. About three hours later – at approximately 6:10 a.m. – Winstead was with the defendant as he gave a statement to an assistant state's attorney. The taking of the statement took "an hour or more." Winstead testified that the defendant did not ask to speak with his parents, nor did he ask that his parents get him a lawyer. Winstead told the court that neither he nor any other officer threatened or coerced the defendant into giving a statement. Neither Winstead nor any other officer told the defendant that if he did not give a statement the police would arrest his family members. The defendant was given soda pop to drink and allowed to use the bathroom.

While the defendant was kept overnight at the police station, we do not agree with the defendant that this amounted to a "wee hours interrogation tactic[ ]." Winstead testified that at about 11 p.m., shortly after his first conversation with the defendant, the defendant joined Winstead and other officers to "various locations in the 7th district and took into custody, three, three other young men who were involved in the shooting." As noted above, Winstead spoke with the defendant again at 3:30 a.m., and then at 6:10 a.m. Based on Winstead's testimony of the events of the evening, we do not consider this situation to be a "wee hours interrogation tactic[ ]." ...

Finally, as noted above, the only witness to complain about physical or mental abuse by the police, including any threats or promises, was the defendant. He testified that he asked the detective and the assistant state's attorney if he could call his parents. He was told that he could not because he was 17 years old and considered an adult. The defendant testified that Winstead and another

5

> detective told him that if he did not give a statement, they would arrest his parents. The court did not believe the defendant's testimony that he was threatened or coerced into giving the police and the assistant state's attorney a statement. ...

*Bridges,* slip op. at 16-19. The Appellate Court concluded that the trial judge's factual findings were not "against the manifest weight of the evidence" and thus upheld the judge's decision to deny Bridges' motion to suppress. *Id.* at 19.

The Appellate Court did not address certain points, specifically the issues surrounding the dealings of the police with Bridges' parents. It is somewhat difficult to determine whether the court's silence indicates that it did not address the point because it found the issue irrelevant or immaterial, or that it implicitly rejected the claims of Bridges' mother. If it did the latter, the court effectively found the facts against Bridges, a finding that would be entitled to a presumption of correctness that, as noted earlier, Bridges had not tried to rebut. For two reasons, however, the Court concludes that the state court simply did not consider the facts relating to Bridges' parents. First, neither the trial court nor the Appellate Court made any mention at all of the testimony of Bridges' mother. Second, as we will discuss later in this decision, the Appellate Court determined that it would not consider factors relating to the authorities' dealings with Bridges' parents. Accordingly, it does not appear that the court implicitly rejected the testimony of Linda Bridges. For this reason, the Court will consider Mrs. Bridges' claims in deciding this case, as that evidence supplements, and does not contradict, the state courts' factual findings. *See Dixon v. Snyder,* 266 F.3d 693, 695 (7th Cir. 2001).

## Discussion

Bridges makes two claims in his habeas corpus petition. First, he contends the Appellate

Court erred by failing to employ the special scrutiny required in reviewing the voluntariness of a minor's confession. Second, Bridges maintains the Appellate Court erred in rejecting his claim that trial counsel was ineffective in failing to formally introduce impeachment evidence at trial.

A petitioner is entitled to a writ of habeas corpus if he is being held under a state court judgment obtained in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Under the 1996 amendments to § 2254, a federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. *Id.* § 2254(d)(1) & (2).

### 1. Voluntariness of Bridges' confession

Bridges contends that the Appellate Court erred in holding that it was unnecessary to apply special scrutiny in reviewing the circumstances of his custodial interrogation and the voluntariness of his statement. Bridges contends that the court's decision was contrary to and an unreasonable application of *In re Gault*, 387 U.S. 1 (1967), and decisions interpreting *Gault*, which require that courts use special caution when evaluating the voluntariness of a minor's confession.

*Gault* cautions that the "greatest care must be taken to assure that the admission [of a minor] was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Id.* at 55. Though *Gault* was specifically concerned with admissions of minors made during a proceeding

to determine delinquency, courts interpreting *Gault* have applied its reasoning to statements during the investigatory stage as well. *See Murray v. Earle*, 405 F.3d 278, 288 (5th Cir. 2005); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001). *But see United States v. Doe*, 155 F.3d 1070, 1073 (9th Cir. 1998) (noting that because the Court in *Gault* declined to establish specific procedural requirements for the investigatory phase, the case is of little specific guidance in a case where a juvenile's statement is taken prior to any proceeding). Other Supreme Court cases likewise confirm that courts need to exercise special caution when assessing the voluntariness of a minor's confession. *See Fare v. Michael C.*, 442 U.S. 707 (1979); *Gallegos v. State of Colorado*, 370 U.S. 49 (1962); *Haley v. State of Ohio*, 332 U.S. 596 (1948).

Though it is evident that courts must take additional precautions when minors are involved to ensure that a confession is voluntarily made, it less clear exactly what applying "special caution" entails. The Supreme Court has held that the totality-of-circumstances approach used to determine the voluntariness of an adult's confession is adequate for evaluating minors' confessions. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Fare*, 442 U.S. at 725; *see also Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). This approach allows courts to take into account "those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." *Fare*, 442 U.S. at 725. *Fare*, which concerns the test to be employed to determine whether a minor waived his *Miranda* rights, mandates that courts inquire into all the circumstances surrounding the interrogation of a minor. *Haley* and *Gallegos* indicate that additional factors become pertinent when evaluating statements made by minors, including the age of the defendant, his or her prior

8

experience with law enforcement officers and the criminal justice system, and whether or not a friendly adult was present to advise the minor when the admissions were made. *See Haley*, 332 U.S. at 600-01; *Gallegos*, 370 U.S. at 54-55.

Bridges urges that the "special caution" language also requires courts to apply a stricter standard when assessing the totality of the circumstances of a minor's confession. Because it is not clear that the "special caution" language prescribes such an approach and it is unnecessary to decide this matter within the context of the case at hand, the Court need not adopt Bridges' interpretation. It is sufficient to observe that when evaluating the voluntariness of a minor's confession, the totality approach requires inquiry into the minor's age, experience, education, background, and intelligence, as well as the other circumstances surrounding the confession. *See Hardaway*, 302 F.3d at 762.

The Illinois Appellate Court correctly identified the totality-of-the-circumstances standard as the governing test to determine the voluntariness of Bridges' confession. *Bridges*, slip op. at 15. The court expressly declined, however, to employ "special scrutiny" in assessing the confession. *Id.* at 16. It reasoned that because Illinois law defines a "delinquent minor" as a minor who violates a law prior to his or her seventeenth birthday, Bridges (who was seventeen years and eleven months old at the time) was not a minor and thus special scrutiny of the circumstances of his confession was unnecessary. *Id.* For the same reason, the court declined to include in its analysis whether Bridges' parents had been present during the questioning, whether the police had frustrated their attempts to confer with Bridges, and whether a youth officer had been present. *Id.*

In this Court's view, the Appellate Court erred in refusing to assess the voluntariness of

9

Bridges' confession as it would have assessed the confession of any minor. The Circuits that have reviewed the voluntariness of the confessions of seventeen year olds have applied the "special caution" standard and have considered the presence or absence of the defendant's parents. *See Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001); *United States v. Doe*, 226 F.3d 672, 679 (6th Cir. 2000); *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997); *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326-27 (3d Cir. 1975). *See also, People v. Hopkins*, 247 Ill. App. 3d 951, 962, 618 N.E.2d 279, 286 (1993) (noting that the presence or absence of a parent is one factor to consider in determining whether the seventeen-year-old defendant's confession was voluntary). There is nothing in the Supreme Court's decisions predating the decision in Bridges' case that suggests that the applicable standard depends on how the legislature of the particular state has chosen to set the cutoff date for determination of juvenile delinquency. And the Supreme Court's more recent decisions make it clear that the Court considers youths under eighteen to be minors for purposes of determining the applicability of federal constitutional protections. *See Roper v. Simmons*, 125 S.Ct. 1183 (2005) (execution of defendant who was seventeen years old at the time he committed murder prohibited by Eighth and Fourteenth Amendments); *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140 (2004) (considering dealings of the police with seventeen-year-old defendant's parents in determining whether defendant was "in custody" for purposes of *Miranda*).

Section 2254(d)(1), however, requires comparison of the state court's decision to the decisions of the Supreme Court as they existed at the time. *Yarborough*, 124 S.Ct. at 2147. At the time of the Appellate Court's decision in Bridges' case, the Supreme Court had not definitively set the chronological age at which the "special caution" requirement ceases to apply.

10

For this reason, and because the court applied the "totality of the circumstances" standard that the Supreme Court had stated should apply, this Court cannot conclude that the state court's decision was contrary to clearly established federal law as determined by the Supreme Court.

Bridges also argues that the Appellate Court unreasonably applied federal law as determined by the Supreme Court. As indicated earlier, there was nothing in the Supreme Court's decisions that suggested that the requirements of "special scrutiny" and consideration of the presence of the defendant's parents depend upon how a particular state legislature has determined to define the cutoff age for consideration of juvenile delinquency petitions. But despite its decision to treat Bridges as an adult for purposes of determining the factors to be considered, the court did expressly assess Bridges' age and experience, as well as his intelligence, background, mental capacity, education, and physical condition. In reaching its decision, the court emphasized that Bridges was almost eighteen and was a high school senior who attended school regularly and received average grades.

The Appellate Court upheld the trial court's rejection of Bridges' claim that he had asked to speak with his parents. The court did not, however, consider the dealings of the police with Bridges' parents. The record supports a finding that the police were less than forthright in their dealings with Linda Bridges prior to her son's arrest and that they frustrated the attempts of Mrs. Bridges and her husband to see their son at the police station. There is good reason to believe that detective Winstead deceived Mrs. Bridges so that he would have the opportunity to question her son without her intervention. But as the Seventh Circuit noted in *Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002), which concerned the interrogation of a fourteen-year-old defendant, "the absence of a friendly adult at [a minor defendant's] confession cannot be deemed

11

dispositive." *Id.* at 765. Rather, this factor may serve to tip the balance "'in marginal cases – when it appears the officer or agent has attempted to take advantage of the suspect's youth or mental shortcomings ....'" *Id.* (quoting *United States v. Wilderness*, 160 F.3d 1173, 1176 (7th Cir. 1998)).

"[T]he weighing of factors under the totality of the circumstances test is a subject on which reasonable minds could differ." *Id.* at 767. Given Bridges' circumstances – particularly that he was just one month short of eighteen – and the Appellate Court's consideration of his age and related factors, the Court cannot say that the Appellate Court's rejection of Bridges' involuntariness claim was an unreasonable (as opposed to an erroneous) application of federal law. Bridges is thus not entitled to relief on this basis.

### 2. Detective Winstead's notes

Bridges contends he was denied effective assistance of counsel because his trial attorney failed to move into evidence Detective Winstead's notes of his questioning of Bridges. He also suggests that the trial and appellate courts erred in holding that police reports used for impeachment are inadmissible in evidence. This holding, however, was made within the context of the Appellate Court's analysis of two of Bridges' arguments on appeal: that the trial court abused its discretion in failing to grant the jury's request to review Detective Winstead's notes, and his alternative argument that he received ineffective assistance of counsel. *See Bridges*, slip op. at 19-25. Bridges does not raise the first issue in his habeas petition, and thus the Court will focus its discussion on the ineffective assistance of counsel claim.

Winstead testified at trial that Bridges admitted during the first interrogation that he was a member of the Mickey Cobras street gang and had acted as a lookout during the shooting. On

12

cross examination, defense counsel attempted to impeach Winstead's testimony with the detective's notes from that interview, marked as Defendant's Exhibit One:

> MR. ARONSON: Is there anywhere in your notes that Darnell Bridges said he was a look out?
>
> WINSTEAD: Those notes?
>
> MR. ARONSON: In these notes.
>
> WINSTEAD: No.
>
> MR. ARONSON: Is there anywhere in these notes that Darnell Bridges told you he was a Mickey Cobra?
>
> WINSTEAD: In those notes?
>
> MR. ARONSON: In these notes.
>
> WINSTEAD: No.
>
> MR. ARONSON: Did you tell this jury on direct examination by the State's Attorney that Darnell Bridges told you that night at 8:30 in your first interview with him that he was a Mickey Cobra?
>
> WINSTEAD: Yes.
>
> MR. ARONSON: And you say that day and you didn't write it in your notes on that evening, is that correct?
>
> WINSTEAD: Yes.

Tr. F 138-39. Defense counsel, however, did not move to admit Winstead's notes into evidence.

Within the first few minutes of jury deliberation, the jury sent a note to the judge requesting to see a copy of Winstead's notes regarding his 8:30 p.m. interview with Bridges. Because the notes had not been entered into evidence, the trial court denied the jury's request, sending the following message to the jury: "You have the evidence and the law; continue in your

13

deliberations." According to Bridges, the jury's request is evidence of the importance of the notes to the jury's decision-making process and demonstrates that he was prejudiced by his lawyer's failure to move the notes into evidence because the jurors were unable to see with their own eyes the discrepancies between the notes and Winstead's testimony.

The Appellate Court correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the governing precedent for Bridges' ineffective assistance of counsel claim. *Bridges*, slip op. at 23-24. To prevail on an ineffective assistance of counsel claim, the defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness and caused the defendant prejudice sufficient to deprive him of a fair trial. *Strickland*, 466 U.S. at 687-88. *Strickland* requires that to prove prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The Appellate Court held that Bridges did not satisfy the first prong of *Strickland*, as the notes would have been inadmissible even if counsel had moved them into evidence, and that counsel's failure to do so was a matter of counsel exercising trial strategy. *Bridges*, slip op. at 24. The court likewise held that Bridges failed to show that but for his counsel's failure to seek admission of the notes into evidence, the outcome of his trial would have been different. *Id.* It reasoned that even if Bridges' defense attorney had sought admission of the notes, it would have been within the discretion of the trial judge to overrule the request. The court also noted that it could not say that the outcome of the trial would have been altered even if the jury had been allowed to review the physical notes during deliberation. *Id.* at 24-25.

The Appellate Court's holding that Bridges was not prejudiced by trial counsel's failure

to seek admission into evidence of Winstead's notes was not an unreasonable application of *Strickland*. Bridges is likely correct that the actual notes made clearer the discrepancy between what Winstead claimed Bridges told him during the interview and what Winstead had recorded. In addition, it is possible the jury may have given more weight to the notes had it been given them to review. The applicable standard, however, is whether the Appellate Court's decision was unreasonable. The Appellate Court correctly noted that it is within the trial court's discretion to determine what evidence is sent to the jury room. *See People v. Criss*, 307 Ill. App. 3d 888, 900, 719 N.E.2d 776, 786 (1999). Thus even if defense counsel had moved to admit the notes, the jury would not necessarily have been allowed to see them. More importantly, Winstead's notes would not have revealed anything new to the jury. Winstead admitted that his notes did not reflect that Bridges had said he was a gang member or had acted as a lookout. This Court cannot say it was unreasonable for the Appellate Court to conclude that allowing the jury to see what it already was aware of would have changed the outcome of the trial. For this reason, the Court need not address whether trial counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

## Conclusion

For the reasons stated above, the Court denies Bridges' petition for a writ of habeas corpus. The Clerk is directed to enter judgment in favor of respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 18, 2005